UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

Approximately 2,117,677.97 USDT

Defendant In Rem.

Civ. No. 26-2644

**VERIFIED COMPLAINT WITH
A STATEMENT OF PROBABLE CAUSE FOR A WARRANT FOR ARREST IN REM**

Plaintiff, United States of America, by its attorney, Jeanine Ferris Pirro, United States Attorney for the District of Columbia by Jafer Aftab, Assistant United States Attorney, appearing brings this Verified Complaint with a Statement of Probable Cause and alleges upon information and belief, as follows:

**Jurisdiction and Venue**

1.      Plaintiff brings this civil action in rem to forfeit and to condemn to the use and benefit of the United States of America the above-captioned cryptocurrency in the amount of 2,117,677.97 USDT (hereinafter, the "Defendant Property"), pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 18, United States Code, Section 981(a)(1)(A).

2.      This court has jurisdiction in this matter pursuant to Title 28, United States Code, Sections 1345 and 1355(a), because the United States is the plaintiff in this in rem forfeiture action.

1

3.      Venue lies in this district especially pursuant to Title 28, United States Code, Section

1335(b)(2), because the defendant property is located in a foreign country.

4.      This Court has the authority to issue a Warrant for Arrest In Rem to bring the defendant

property into this District pursuant to Title 28, United States Code, Section 1355(d) and Federal

Rules of Civil Procedure, Supplemental Rule G(3) on a showing of probable cause. The

defendant property is currently in the custody of a foreign entity.

### Defendant Property

5.      The defendant property is approximately 2,117,677.97 USDT, a total sum of funds

attributable to the following virtual currency address:

0xf322a3328f617b9f3d44a088373d1106b6c5e97e (hereafter Subject Virtual Currency Address),

that is in the custody and control of the foreign entity, Tether International, S.A. de C.V.

### Statutory Background

6.      Pursuant to 18 U.S.C. §§ 1343 and 1349, 2, and 3, it is a punishable crime to attempt, be

complicit, or conspire to devise or intend to devise any scheme or artifice to defraud, or for

obtaining money or property by means of false or fraudulent pretenses, representations, or

promises, to transmit or cause to be transmitted by means of wire, radio, or television

communication in interstate or foreign commerce, any writings, signs, signals, pictures, or

sounds for the purpose of executing such scheme or artifice.

7.      Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or

is derived from proceeds traceable to a violation of a specified unlawful activity as defined by 18

U.S.C. § 1956(c)(7) that includes a further listing of specified unlawful activity in 18 U.S.C. §

1961, which includes wire fraud, 18 U.S.C. § 1343, is subject to forfeiture to the United States.

8.      Pursuant to 18 U.S.C. §§ 1956(a)(1)(A)-(B), 1956(c), and 1956(c)(7)(B)(i), 2, and 3, the punishable crimes of money laundering are defined as whoever knowing that property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity or, alternatively, knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, or, alternatively, to avoid a transaction reporting requirement under State or Federal law. Specified unlawful activity includes wire fraud as proscribed by 18 U.S.C. § 1343. The term "knowing that property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is a "specified unlawful activity." The term "conducts" includes initiating, concluding, or participating in initiating, or concluding a transaction. The term "transaction" includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition. A financial transaction shall be considered one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement. The term "financial transaction" also includes a transaction which in any way or degree affects interstate or foreign commerce involving the movement of funds by wire or other means, or involving one or more monetary instruments, or involving the transfer of title to any real property, vehicle, vessel, or aircraft, or a transaction involving the use of a financial institution which is engaged in, or the

3

activities of which affect, interstate or foreign commerce in any way or degree. The term monetary instrument includes, among other things, currency of the United States or any other country.

9.      Pursuant to 18 U.S.C. § 1956(a)(2)(A)-(B), 1956(c), and 1956(c)(7)(B)(i), 2, and 3, the separate punishable crimes of international money laundering are defined as whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represents the proceeds of some form of unlawful activity with the intent to promote the carrying on of specified unlawful activity or, alternatively, knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the source, the ownership, or the control of the proceeds of the specified unlawful activity or, alternatively, to avoid a transaction reporting requirement under State or Federal law. Specified unlawful activity includes wire fraud as proscribed by 18 U.S.C. § 1343.

10.     Pursuant to 18 U.S.C. § 1956(f), there is extraterritorial jurisdiction over the conduct prohibited in this section if the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part of the United States and the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

11.     Pursuant to 18 U.S.C. § 1956(h), the crime of money laundering is further defined as including a conspiracy to commit a violation of 18 U.S.C. § 1956 or 18 U.S.C. § 1957.

12.     Pursuant to 18 U.S.C. § 1957, defines the crime of engaging in a monetary transaction in property derived from specified unlawful activity as whoever knowingly engages or attempts to

engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.

13.    Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of sections 18 U.S.C. §§ 1956 and 1957 or any property traceable to such property is subject to in rem forfeiture to the United States.

Manner and Means of Cryptocurrency Fraud-Money Laundering Schemes

14.    Cryptocurrency investment fraud schemes are initiated on a marketing effort touting the upside of cryptocurrency volatile investments followed by a false presentation of increased value usually by way of false website exhibits. Once deceived, the victim of the fraud transfers cryptocurrency for the investment, but unbeknownst to the victim, that transfer does not result in the victim's ongoing control of his or her funds as expected in a legitimate brokerage business arrangement, but instead is transferred to the control of the fraud-money laundering scheme operators without the victim's consent.

15.    Once the fraud-money laundering scheme operators gain initial control, additional psychological techniques and deceptions are employed to extract more cryptocurrency value from the victims in the form of more investments, claims for taxes owing, claims for funds required to finance reversals, among other deceptions.

16.    Criminals often utilize cryptocurrency to transfer proceeds of crime or to launder funds because the cryptocurrency financial system is often anonymous by design and without know-your-customer requirements, there is often no customer service to reverse transactions, and there is no deposit insurance on cryptocurrency funds. The fraud scheme operators simultaneously seek the advantage of the cryptocurrency platform while preying on the insecurity and anticipated shame of the victim to avoid reporting the loss. In that important timeframe, the fraud

scheme operators seek to frustrate efforts to detect their crimes, either by private investigators or law enforcement, by employing money laundering techniques by transferring the cryptocurrency in ways to conceal or disguise the nature, the source, the ownership, or the control of the proceeds of the fraud scheme or further promoting the scheme or without issuing the necessary financial reporting forms.

17.     Generally, it is advantageous for fraud scheme operators to avoid loss of criminal proceeds by avoiding use of United States-regulated banks, because they are required to comply with Know-Your-Customer (KYC) identification and due diligence requirements to detect and avoid financial crime, as required by the Bank Secrecy Act of 1970 (BSA).

18.     In the training and experience of the verifying declarant, the emergence of cryptographic methods of transferring digitized units of value/property is advantageous because it allows for the transfer of property while avoiding BSA compliance. In particular, a cryptocurrency account does not have any personal identifying information attributable to it other than a public cryptographic identifier. Furthermore, the use of cryptocurrency is also advantageous because it permits rapid anonymous global computerized transfer of value/property.

19.     In the training and experience of the verifying declarant, fraud scheme operators are utilizing established cryptocurrencies, because of the substantial international market participation in these cryptocurrencies as a method of storing a unit of value and ability to exchange or transfer somewhat stable value while avoiding KYC and due diligence requirements.

20.     Many cryptocurrencies, including Bitcoin, Ethereum, and Tether, operate via a blockchain that provides for a recording and verifying process of every transaction ever conducted that is distributed throughout an international computer network. The blockchain will

not list the names of parties or beneficiaries to the transaction but will list the date and time of the transaction, the originating and receiving public addresses, and how much cryptocurrency was transferred. The verification process requires certain trusted maintainers of the computer network nodes to independently undertake a joint examination of the blockchain before the transaction is accepted and recorded as a new unique hash code to be recorded on the blockchain to maintain its reliability as immutable. There are different blockchains. Generally, verification and recordation is measured in minutes for valid addresses.

21.    In the training and experience of the verifying declarant, fraud scheme operators are engaging in money laundering transfer techniques. Sometimes, preliminary very low value transfers are utilized to test the trustworthiness of the digitized transfer. Ultimately, upon receipt of the remaining substantial value, the operators engage in a sequence of further transfers in a short period of time through numerous cryptocurrency accounts and piecemeal transfers to make detection or tracing difficult. This method is known in the industry as wallet hopping – here a wallet refers to the public address (account) information contained in the wallet. The inference of money laundering concealment is present, because further transfers typically incur cryptocurrency costs, known in the industry as gas fees, calculated based on energy, bandwidth, and transaction type, which are in tension with the legitimate business purposes of preserving the legitimate business proceeds, value, and realizing percentage fees. While this presents a financial cost, it provides the advantage of concealing the location, nature, source, ownership, or control to avoid detection and enhance the ability of the fraud scheme operators to continue their criminal enterprises.

22.    In the training and experience of the verifying declarant, aside from utilizing pass-through accounts as a method of concealment, fraud scheme operators also utilize a method of

transferring across, between, or among different blockchain computerized system platforms to render detection or tracing difficult.

23. In the training and experience of the verifying declarant, fraud scheme operators as well as general market participants seek to avoid overall volatility in the valuation of cryptocurrencies. Given this market demand, certain cryptocurrency system platforms offer a product referred to in the industry as a stablecoin. A stablecoin is a cryptocurrency product pegged to a certain commodity's price, such as gold, or to a more stable fiat currency, such as the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives. Stablecoin products offered by Tether ("USDT") and USD Coin ("USDC") are two popular stablecoins. They are both pegged to the U.S. dollar.

24. In the training and experience of the verifying declarant, and as present in this case, the prevalent investment in stablecoin by the fraud scheme operators exhibits the deception present in the fraud scheme, insofar as the fraud scheme operators do not truly believe in the upside of volatile cryptocurrency provided by decentralized finance, but in the certainty of their deception and interest in preserving their criminal proceeds in the stable value of the United States dollar supported by centralized banking finance.

**Cryptocurrency Terminology**

25. <u>Virtual Currency/Cryptocurrency</u>: Virtual currencies are digital representations of value that, like traditional coin and paper currency, function as a medium of exchange (i.e., they can be digitally traded or transferred, and can be used for payment or investment purposes). Virtual

currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin and Ether, are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

26.    Blockchain:  A blockchain is a digital ledger run by a decentralized network of computers referred to as "nodes." Each node runs software that maintains an immutable and historical record of every transaction utilizing that blockchain's technology. Many digital assets, including virtual currencies, publicly record all of their transactions on a blockchain, including all of the known balances for each virtual currency address on the blockchain. Blockchains consist of blocks of cryptographically signed transactions, and blocks are added to the previous block after validation and after undergoing a consensus decision to expose and resist tampering or manipulation of the data. There are many different blockchains used by many different virtual currencies. For example, Bitcoin in its native state exists of the Bitcoin blockchain, while Ether (or "ETH") exists in its native state on the Ethereum network.

27.    Blockchain Analysis: Law enforcement can trace transactions on blockchains to determine which virtual currency addresses are sending and receiving particular virtual currency.

9

This analysis can be invaluable to criminal investigations for many reasons, including that it may enable law enforcement to uncover transactions involving illicit funds and to identify the person(s) behind those transactions. To conduct blockchain analysis, law enforcement officers use reputable, free open-source blockchain explorers, as well as commercial tools and services. These commercial tools are offered by different blockchain-analysis companies. Through numerous unrelated investigations, law enforcement has found the information associated with these tools to be reliable.

28.     Blockchain Bridge:  A bridge protocol, also known as a cross-chain bridge, is a software application that enables the direct transfer of assets/value across different blockchains (e.g., from the Bitcoin blockchain to the Ethereum network). When a bridge protocol user initiates a transaction from one blockchain to another, the user specifies the number of coins or tokens (i.e., the value) that the user would like to send from the originating blockchain to the destination blockchain.

29.     Virtual Currency/Cryptocurrency Address: A virtual currency address is an alphanumeric string that designates the virtual location on a blockchain where virtual currency can be sent and received. A virtual currency address is associated with a virtual currency wallet.

30.     Virtual Currency/Cryptocurrency Exchange: A virtual currency exchange ("VCE"), also called a cryptocurrency exchange, is a platform used to buy and sell virtual currencies. VCEs allow users to exchange their virtual currency for other virtual currencies or fiat currency, and vice versa. Many VCEs also store their customers' virtual currency addresses in hosted wallets. VCEs can be centralized (i.e., an entity or organization that facilitates virtual currency trading between parties on a large scale and often resembles traditional asset exchanges like the

exchange of stocks) or decentralized (i.e., a peer-to-peer marketplace where transactions occur directly between parties).

31.     Virtual Currency/Cryptocurrency Wallet:  A virtual currency wallet (e.g., a hardware wallet, software wallet, or paper wallet) stores a user's public and private keys, allowing a user to send and receive virtual currency stored on the blockchain. Multiple virtual currency addresses can be controlled by one wallet.

32.     Unhosted Wallet:  An unhosted wallet, also known as a self-hosted, non-custodial wallet, is a virtual currency wallet through which the user has complete control over storing and securing their private keys and virtual currency. Unhosted wallets do not require a third party's involvement (e.g., a virtual currency exchange) to facilitate a transaction involving the wallet. Unhosted wallets allow users to generate and manage their own virtual currency addresses.

33.     Private Key: Each virtual currency address is accessed and controlled through use of a unique private key that simultaneously, cryptographically corresponds to the public key and cryptographically corresponds to an original seed phrase. It is a cryptographic equivalent of a password, which is needed to mate with the public key, and, in turn, the virtual currency address, to access and control cryptocurrency fund balances. Only the holder/user of the private key can access or control a transfer of virtual currency from the corresponding public address to another public address.

34.     Decentralized Exchange: A decentralized exchange (or "DEX") is a peer-to-peer marketplace where users can trade virtual currencies directly with other traders without centralized intermediaries. Users generally retain control over their virtual currency rather than entrusting a central authority to host funds in a centralized or "hosted" wallet. DEXs are operated

by self- executing agreements written in code, known as "smart contracts," which automate the trading process. DEXs will algorithmically track the prices of various virtual currencies and often leverage locked reserves of virtual currencies (or other digital assets). These locked reserves are known as "liquidity pools," and they are often used to facilitate trades. DEXs are built on blockchains that support smart contracts, including Ethereum, and often levy fees for their services.

35.    Transaction Fee: A transaction fee is a fee paid by the party sending virtual currency on a blockchain to reward miners and/or validators for verifying and validating transactions. Transaction fees vary by blockchain and can fluctuate based on factors such as blockchain network traffic and transaction sizes. Senders of virtual currency can increase the transaction fees that they pay to have their transactions confirmed faster by miners and/or validators. Transaction fees are generally paid in a blockchain's native token (e.g., Bitcoin on the Bitcoin blockchain). On the Ethereum network, these transaction fees are called "gas fees." Gas fees are transaction costs paid in Ether ("ETH"), or its fraction, gwei. These fees serve as a form of remuneration for validators who maintain and secure the network. Gas fees fluctuate based on supply, demand, and network capacity, and may increase during periods of network congestion.

36.    Stablecoins: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, Tether (also known as USDT) is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

37.    Tether: Tether International S.A. de C.V. ("Tether") is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

38.    WhatsApp: A Meta platform software application that provides electronic messaging service that allows users to communicate via instant message writings or voice over internet protocol both involving the use of wire or radio transmission affecting interstate or foreign commerce. WhatsApp allows users to engage in peer-to-peer basic message writings, or the creation of group chat writings, or sending of unlimited images, audiovisual media messages, or voice calls. Unlike more limited traditional telephone communication plans, WhatsApp users may communicate with any other user in or around the world.

Importantly, WhatsApp features end-to-end communication encryption that prevents interception and only permits the other end user to decrypt the communication. In this way, WhatsApp communications or more private than standard short messaging service (SMS) or multimedia messaging service (MMS) communications.

Equally important, a WhatsApp user can choose any country's phone number with any regional exchange regardless of physical residence or location. It is common for cryptocurrency investment fraud operatives to utilize WhatsApp for its capacity for deception and secrecy.

**Statement of Probable Cause**

39.    The United States Secret Service (USSS) and Federal Bureau of Investigation (FBI), through the Memphis Virtual Currency Task Force (MVCTF), are investigating cryptocurrency investment fraud (CIF) schemes. In 2024 alone, more than 41,000 complaints of CIF were received by the FBI's Internet Complaint Center (IC3), resulting in $5.8 billion in reported losses. CIF schemes are often orchestrated by criminal syndicates, predominantly operating in Southeast Asia.

40.     Cryptocurrency investment fraud schemes are initiated on a marketing effort touting the upside of cryptocurrency volatile investments followed by a false presentation of increased value usually by way of false website exhibits. Once deceived, the victim of the fraud transfers cryptocurrency for the investment, but unbeknownst to the victim, that transfer does not result in the victim's ongoing control of his or her funds as expected in a legitimate brokerage business arrangement, but instead is transferred to the control of the fraud-money laundering scheme operators without the victim's consent.

41.     Once the fraud-money laundering scheme operators gain initial control, additional psychological techniques and deceptions are employed to extract more cryptocurrency value from the victims in the form of more investments, claims for taxes owing, claims for funds required to finance reversals, among other deceptions.

42.     The fraud-money laundering scheme operators then transfer proceeds of crime or  launder funds because the cryptocurrency financial system is often anonymous by design and without know-your-customer requirements, there is often no customer service to reverse transactions, and there is no deposit insurance on cryptocurrency funds. The fraud-money laundering scheme operators simultaneously seek the advantage of the cryptocurrency platform while preying on the insecurity and anticipated shame of the victim to avoid reporting the loss. In that important timeframe, the fraud scheme operators seek to frustrate efforts to detect their crimes, either by private investigators or law enforcement, by employing money laundering techniques by transferring the cryptocurrency in ways to conceal or disguise the nature, the source, the ownership, or the control of the proceeds of the fraud scheme or further promoting the scheme or without issuing the necessary financial reporting forms.

<u>Victim 1</u>

43.     Pursuant to an interview with K. X., a resident of Germantown, Tennessee, and on information and belief, in April 2024, K. X. (hereafter VICTIM 1) discovered an advertisement on a Los Angeles job board seeking employees for a food packaging company. Upon contacting the listed phone number, she spoke with a persona identifying himself as Hung, who collected her personal information and advised her that a supervisor would follow up with her within a few days. Shortly thereafter, another persona identifying himself as Jason contacted VICTIM 1 via WhatsApp regarding potential employment opportunities. MVCTF reviewed VICTIM 1's preserved Whatsapp messages that corroborated her interview responses.

44.     During these communications, VICTIM 1 disclosed that she was recently retired and had previously owned a food business that she had sold. She ultimately determined that the positions offered were not suitable. Notwithstanding, Jason maintained communication with VICTIM 1. In May 2024, Jason inquired whether VICTIM 1 had any interest in cryptocurrency investing and subsequently spent a substantial period of time instructing her on purported cryptocurrency investment strategies. Jason directed VICTIM 1 to download the CoinMetro application for investment tracking and to utilize a virtual private network (VPN) for secure access.

45.     On May 16, 2024, and as subsequently corroborated through reliable and trustworthy blockchain analysis, VICTIM 1 initiated cryptocurrency transactions at Jason's direction, beginning with a transfer of approximately $2,500 in Tether's stablecoin, USDT, from her Crypto.com account.

46.     On May 23, 2024, as subsequently corroborated through reliable and trustworthy blockchain analysis, VICTIM 1 made an additional transfer of approximately $9,500. Following these transactions, VICTIM 1 accessed the CoinMetro application which exhibited apparent

profits. The application further exhibited marketing material that increased investment amounts would yield higher returns.  Below is an image of a screenshot obtained from Victim 1 of the website's face page for CoinMetro.



47.    Pursuant to Jason's communications and inducements, VICTIM 1 made additional investments through in-person U.S. currency transfers. On three separate occasions, individuals arrived at her residence, to collect U.S. currency from VICTIM 1.

48.     On May 28, 2024, two unidentified males collected approximately $200,000 in U.S. currency at VICTIM 1's residence.

49.     On June 3, 2024, two males returned to the same location and collected approximately $300,000 in U.S. currency.

50.     On June 10, 2024, two males again arrived and collected an additional $300,000 in U.S. currency. VICTIM 1 advised MVCTF law enforcement officers that the source of the U.S. currency was from the sale of her business. A subsequent review of VICTIM 1's bank records corroborate VICTIM 1's assertion.

51.     For each currency transaction, a password was exchanged between VICTIM 1 and the individuals collecting the funds. The password corresponded to the serial number of a U.S. currency bill provided to VICTIM 1 in advance by purported Customer Service. VICTIM 1 reported that a white Lexus SUV bearing a New York registration plate was likely used for the first two collections, while a dark-colored sedan was used for the third. In each instance, the individuals contacted VICTIM 1 approximately fifteen minutes prior to arrival. Following each collection, a corresponding balance increase was exhibited on the CoinMetro application.

52.     In July, 2024, Jason persuaded VICTIM 1 to liquidate her Charles Schwab brokerage account and transfer the proceeds for additional cryptocurrency investment. VICTIM 1 transferred her Charles Schwab brokerage account funds to her Bank of America account. On July 11, 2024, she wired $100,000 from her Bank of America account to an account attributed to Old Cantonese, Inc., located at 7218 18th Avenue, Brooklyn, New York 11204. On July 30, 2024, she wired an additional $100,000 directly from her Charles Schwab brokerage account to LEYDIY Trade, Inc.

53. In August 2024, Jason sought to induce VICTIM 1 to engage in purported Bitcoin options trading until approximately August 22, 2024. At that time, apparently uncomfortable with the level of risk associated with options trading, VICTIM 1 expressed her intent to withdraw her funds. She was then advised by Jason and CoinMetro Customer Service that she was required to pay taxes prior to any withdrawal. In reliance on these representations, VICTIM 1 wired the following funds on September 3, 2024, to an account associated with YI LI (Canadian Passport Number HC7256I6), located at 18F-6128 Patterson Avenue, Burnaby, British Columbia V5H 4P3, Canada: A) $150,000 from her Charles Schwab brokerage account; B) $70,000 from her Edward Jones brokerage account; and C) $80,000 from her Dominion Partners brokerage account.

54. Throughout September and early October 2024, communication between Jason and VICTIM 1 decreased. In October, 2024, Jason told VICTIM 1 that his business was experiencing financial hardship and solicited additional funds. Jason advised VICTIM 1 to borrow money from others.

55. In November 2024, Jason admitted that funds previously sent by VICTIM 1 had not been invested as represented, but were used instead for his personal business needs. He continued to request additional funds, telling VICTIM 1 that she could only access approximately $5 million in purported investment profits if she made payment for putative outstanding taxes. Jason asserted that the total tax liability was $1,500,000, but that he would contribute $1,100,000, so that VICTIM 1 would need to contribute $400,000.

56. On November 20, 2024, VICTIM 1 wired $200,000 from her Charles Schwab brokerage account to an account attributed to YD Transportation, Inc., located at 1135 Calle Flor, Montebello, California 90640.

57.    On November 21, 2024, VICTIM 1 wired an additional $210,000 to the same entity. Despite confirmation that the funds were successfully transmitted by VICTIM 1's sending financial institution, Jason and Customer Service claimed the funds were not received in early January 2025. Jason continued to maintain that the November wire transfers had not been received and that VICTIM 1 still owed approximately $400,000 in taxes.

58.    Finally frustrated, VICTIM 1 disclosed her situation to her children, who conducted an independent review and determined that VICTIM 1 had not been interacting with a legitimate investment platform, but rather a fraudulent website located at www.xzyiar.top.

59.    MVCTF law enforcement officers checked the previous stated domain in Archive.org, a reliable and trustworthy domain utilized by law enforcement, to collect information for possible historical events to no avail.

60.    On or about January 22, 2025, VICTIM 1 informed Jason and Customer Service via WhatsApp that she could obtain $150,000 in cash from a friend for an additional payment. On February 1, 2025, Customer Service advised that a courier would be dispatched to collect the funds. On February 2, 2025, a password was provided to VICTIM 1 to verify the courier's identity.

61.    On February 3, 2025, an unidentified individual met VICTIM 1 in person in front of her residence, to collect $150,000 in U.S. currency. The individual correctly provided the prearranged password. After receiving the funds, the individual departed the location and was subsequently stopped by the Germantown Police Department. The U.S. currency provided by VICTIM 1 was recovered from the individual's vehicle.

**Virtual Currency Financial Transaction History for VICTIM 1**

62.     MVCTF law enforcement officers conducted a blockchain analysis from the reliable and trustworthy blockchain, as well as commercial records from TRM labs that are consistent with the blockchain analysis, and found the following financial transaction trace.  The transactions began on May 23, 2024, when approximately 9,706.00 USDT was transferred from VICTIM 1's exchange account and sent to wallet address: **0x2104f1f1450046aede0e9f15bcf842998a954ce6 (hereafter 4ce6)**. On the same date, an operative immediately transferred from wallet address **4ce6** to wallet address: **0xdc204389d1f7b923eeec3a1e342fff1fbeaa1a51 (hereafter 1a51)** in the same amount, indicating a complete pass-through sequence of transfers.



63.     Also on May 23, 2024, an operative transferred approximately 68,694.00 USDT from wallet address **1a51** to wallet address **0x8c00c947a8b379cd20565f2693ab6c8a3c8269e4**.

---

[1] All blockchain images in this document reflect a percentage increase or decrease in the monetary value of stablecoins at a fluctuation between image and Affiants Statement.

During this same timeframe, an operative transferred an additional 14,927.00 USDT from wallet address **1a51** to wallet address **0x2a630a523c85a4bd6411bb8b35bb1d916bbb77bb (hereafter 77bb)**, reflecting a splitting of funds into separate wallet addresses.

64.    After these initial transfers, on August 28, 2024, an operative transferred 198,671.00 USDT from wallet address **77bb** to wallet address

**0xe2cf44e38184d0c9e37af0f3daf1ba7656d55a87**.

65.    From this point in the transaction chain, the private key holder/s or user/s utilized intermediate wallet addresses to further split the funds. In the training and experience of the verifying declarant, the transfer activities exhibit money laundering techniques of pass-through transfers and splitting of transfers to further conceal the nature, location, source, ownership, or control. Subsequent consolidation where funds originating from various wallet addresses are recombined into fewer wallet addresses closer to the ultimation intended destination exhibit even more complex layering money laundering techniques that advance the criminal interests of operatives to aggregate value for ultimate realization of gain while attempting to obscure the original source of funds. This pattern of dispersion followed by consolidation is consistent with money laundering techniques designed to defeat straightforward transaction tracing present in legitimate business financial transactions and to create ample separation between the victim's origin funds and the eventual subject controlled wallet to advance and preserve the criminal enterprise.

66.    On September 11, 2024, an operative transferred approximately 924,995.00 USDT from wallet address **0x1eefbca8d3b795491762784cce6e26de9f596501** to wallet address

**0x35d6b72ebe461940e534c0854c7016ac9cbed25b** (hereafter d25b)**, and then immediately transferred from wallet **d25b** to wallet address

**0xa1826f6972574c0076f8d8be0f0d2f25b7bc3d1d8e36ffa8a31816b836ded850** in the same amount exhibiting further evidence of pass-through money laundering activity. The transfers continued with a consolidation transaction to the **SUBJECT VIRTUAL CURRENCY WALLET** on September 11, 2024.

**Victim 2**

67.     Pursuant to an interview with R. M., a resident of Murfreesboro, Tennessee, and on information and belief, in November 2024, R. M. (hereafter VICTIM 2) reported that he found an investment-related video on TikTok featuring Elon Musk discussing opportunities to make money through trading. After clicking a link associated with the video, VICTIM 2 was redirected to a WhatsApp page. Shortly thereafter, VICTIM 2 was contacted via WhatsApp by a persona identifying herself as Aretha Eileen, who claimed to represent New World Asset Management (hereafter NWAM). Aretha communicated with VICTIM 2 using the telephone numbers with Los Angeles area, California area codes: (213) 661-5749 and (213) 492-1130. Although initially skeptical, VICTIM 2's concerns were lessened when Aretha stated that she would and subsequently did advance $500.00 to VICTIM 2 marketed as a trial investment on the platform.

68.     Following this initial interaction, Aretha Eileen continued to act as VICTIM 2's primary point of contact and coordinator. VICTIM 2 was also introduced to an individual named Don Adam Perera, who was presented as a group leader and trading analyst. Don provided trading instructions, charts, and market data, directing VICTIM 2 on how and when to execute trades. Don Adam Perera utilized the telephone number with a San Francisco Bay, California area code: (510) 365-9606. All communications with both individuals occurred exclusively through WhatsApp. Additionally, VICTIM 2 was provided with documentation labeled "New World Asset Management LTD," which was used to present the organization as legitimate.

22

69.    The image below is the documentation that was sent to VICTIM 2.



**New World Asset Management Ltd**

Dear Mr. Ron,

According to the rules of the profit plan provided by New World Asset Management, you currently pay NWAM a commission of 3% of your Brightcoin account assets, totaling 1,110,658.74 USDT. In view of your situation, after discussion, it has been decided to allow you to pay the commission in installments. You are currently required to pay 555,329.37 USDT as the first installment of the commission, and the remaining 555,329.37 USDT will be paid immediately after the withdrawal is successful.

Once you have received the payment of 555,329.37 USDT, your Brightcoin trading account, including the investment principal and any accrued profits, will be available for withdrawal as usual. Please complete the payment before 12:00 noon EST on February 10, 2025.

Please note that any violation of the relevant terms will result in corresponding penalties, and you are entitled to compensation from New World Asset Management for twice the total amount of funds held in your Brightcoin trading account.

The following is the commission payment address of New World Asset Management Ltd.: 0x5b7f2f175bc0332bdb419a21011d00f28e7c5050

Best regards,

Finance Department of New World Asset Management LTD

January 31, 2025

70. At the direction of Aretha and Don, VICTIM 2 was instructed to utilize a trading platform identified as Brightcoin (Br-t).

71. A subsequent search by MVCTF revealed recent reports and online warnings that Brightcoin (often operating as brightcoin.cc) is a fraudulent cryptocurrency trading platform and scam operator. It is designed to appear as a professional investment site, but it is a deposit trap that steals the user's funds. A subsequent search by MVCTF of NWAM with California state records and the IC3 FBI database, revealed that NWAM had a registered agent by the name of Don Adam Perera, who is apparently deceased, and there were nine scam complaints naming NWAM in the FBI IC3 databse. At the time of the interview, VICTIM 2 maintained that he was unaware of this information at the time of his communications with the representatives when he relied on their representations.

72. To facilitate investments, VICTIM 2 was instructed to transfer funds from his personal bank account into a Coinbase account that the representatives created. From there, VICTIM 2 transferred cryptocurrency funds into a Brightcoin account using wallet address information provided by NWAM representatives. These steps were repeated multiple times, and VICTIM 2 retained records of these financial transactions, including documentation showing transfers into the designated cryptocurrency account.

73. On November 19, 2024, VICTIM 2 initiated his first investment in the amount of 5,000.00 USDT. Following this initial deposit, VICTIM 2 continued to invest additional funds over time. This increasing investment was influenced by consistent representations of high returns, positive account performance, and ongoing encouragement from Aretha Eileen and Don Adam Perera.

74.     Throughout the investment period, the Brightcoin platform displayed what appeared to be substantial profits and steady account growth. VICTIM 2 reported that these displayed gains reinforced his belief that the investment activity was legitimate. Relying on the recommendations provided, VICTIM 2 continued to deposit funds. A review of VICTIM 2's Coinbase transaction history reflects multiple transfers that would later result in a significant cumulative financial loss.

75.     At a later stage, VICTIM 2 received an exhibit with a projected account balance indicating a payout total of $37,021,958.00. Upon attempting to access these funds, VICTIM 2 was informed by the operatives involved that a 3% commission payment was required prior to withdrawal. This commission amounted to $1,110,658.74 and was presented as a standard processing requirement. Supporting documentation labeled Payout was provided to VICTIM 2.

76.     VICTIM 2 reported that despite the representations of a large payout and the demand for additional funds, no withdrawal was ever completed, and no funds were received. After being unable to access the account balance and recognizing inconsistencies in the process, VICTIM 2 concluded that he had been the target of a coordinated cryptocurrency investment fraud scheme and he reported the matter to the FBI through their IC3 online complaint portal and database.

### Virtual Currency Financial Transaction History for Victim 2

77.     MVCTF undertook a blockchain analysis to verify the financial transactions related by VICTIM 2 on the sufficiently reliable and trustworthy blockchain as well as review of reliable and trustworthy records provided by TRM labs that were consistent with the blockchain analysis. The virtual currency financial transactions began on November 26, 2024, when approximately 290,933.00 USDT was sent from wallet address **0x390905dfb3c5e4762a939a3bce1c29293664a7b7** to wallet address **0xe1448e32bd5130b5bba1034e96f494982836c202**, where the funds settled on November 27,

2024 in the amount of approximately 293,171.00 USDT. Consistent with the information set forth in Paragraph 50 above, MVCTF law enforcement research of commercial tracing software with supporting open-source links notated this wallet address as a functional scam wallet address.

78.    The first three financial transactions of VICTIM 2 funds were transferred by operatives as set forth in the depiction below.



79,    On November 27, 2024, the operatives rapidly transferred the funds, in a pass-through and splitting pattern consistent with that money laundering layering technique to obscure the location, nature, origin, ownership, or control of criminal proceeds. During this phase, approximately $261,204.00 was sent to wallet address address**0xc2b59cc404f76a63cf3454a772cb19e210e97ec9.** MCVTF law enforcement officers

also found that this wallet address was identified in multiple open-source intelligence forums, including the usdtbanlist.com website, as a functional scam wallet address.

80.     The below image is the exhibit from the open-source intelligence on the wallet ending in **7ecp** above as a blacklisted wallet address.

81.     Additionally, an operative transferred 262,467.00 USDT to wallet address **0xdd23ee55325ce2d721e82c26b8d5ea3c04b48cf7**, and 391,937.00 USDT to wallet address **0x383fa093f947ed2a4bef13d1f63b4005adcb87de**. Overall, this reflects a transition from the pass-through and splitting phase into a consolidation phase, where funds are recombined for further transfer. Later that same day, an operative transferred 357,047.00 USDT was sent to wallet address **0x341a04342360dc93f181d8d586826e52fe001425**. The near-simultaneous distribution of funds across multiple newly utilized wallet addresses enhances the complexity in

investigating and tracing which creates manifest inferences of multiple cryptocurrency money laundering strategies.

82.    Following this distribution phase, on December 1, 2024, an operative transferred approximately 637,085.00 USDT from an intermediary wallet address to wallet address **0xc3dbad415d1fa4b56f8ff1f40e43c401045a9ea3**. This transfer is indicative of a consolidation step, where previously dispersed funds are recombined into a single wallet or fewer wallets after initial pass-through or splitting layering. Such consolidation often occurs after sufficient transactional complexity has been introduced to further hinder straightforward tracing.

83.    An operative subsequently transferred 639,859 USDT from wallet address **0xc3dbad415d1fa4b56f8ff1f40e43c401045a9ea3** to the **SUBJECT VIRTUAL CURRENCY ADDRESS.**

Other Suspected Fraud Proceeds Traced to the SUBJECT VIRTUAL CURRENCY ADDRESS

84.    The MVCTF has identified other suspected victims, pursuant to a review of the FBI IC3 database, and blockchain analysis, but has not yet been able to communicate with 9 other victims[2] (out of 13 currently suspected victims) who reported that they had sent a combined amount of approximately 320,903 USDT to a group of wallet addresses previously unknown to law enforcement between on or about May 2024 through January 2025. The unknown fraud scheme and money laundering operatives laundered approximately 587,141 USDT of these suspected fraud victim funds through 76 separate virtual currency addresses within the span of 9 months, ultimately depositing the suspected fraud victim funds in the **SUBJECT VIRTUAL**

---

[2] Two victims submitted reports to federal law enforcement on IC3.gov, reporting being scammed and sending funds to the addresses discussed in this paragraph. Three other victims sent funds from virtual currency exchanges to the addresses discussed in this paragraph and submitted fraud reports to those exchanges asserting that they had been scammed and that the addresses they sent funds to were part of a fraud scheme.

**CURRENCY ADDRESS** as shown in the chart below. Pursuant to a lowest intermediate balance tracing methodology, MVCTF law enforcement officers determined that 587,141 USDT in fraud victim proceeds are still currently contained in the **SUBJECT VIRTUAL CURRENCY ADDRESS**.

85.    The exhibit immediately below is a set of columns that notes the assigned victim number, the victim's reported loss, the victim's traceable proceeds in the SUBJECT VIRTUAL CURRENCY ADDRESS pursuant to a lowest intermediate balance tracing, and the victim's initial deposit.

| Vic # | Total Reporte | Proceeds Amount | Initial Deposit |
|---|---|---|---|
| VIC 1 | $750,000.00 | $ 357.00 | $ 9,706.00 |
| VIC 2 | $458,000.00 | $ 261,000.00 | $ 290,933.00 |
| Vic 3 | | $ 84,391.00 | $ 97,251.00 |
| Vic 4 | | $ 128,000.00 | $ 146,230.00 |
| Vic 5 | | $ 26,777.00 | $ 26,777.00 |
| Vic 6 | | $ 7,201.00 | $ 7,201.00 |
| Vic 7 | | $ 4,818.00 | $ 4,818.00 |
| Vic 8 | | $ 4,881.00 | $ 4,881.00 |
| Vic 9 | | $ 15,050.00 | $ 14,469.00 |
| Vic 10 | | $ 15,050.00 | $ 14,470.00 |
| Vic 11 | | $ 16,197.00 | $ 24,126.00 |
| Vic 12 | | $ 8,000.00 | $ 8,896.00 |
| Vic 13 | | $ 15,419.00 | $ 15,419.00 |
| | | $ 587,141.00 | $ 665,177.00 |

86.    The following image is a depiction of the financial transaction history that shows the cryptocurrency funds pass-through and splitting transfers to a consolidation wallet address **0x383fa093f947ed2a4bef13d1f63b4005adcb87de** before further pass-through and splitting

transfers into another consolidation wallet address, the **SUBJECT VIRTUAL CURRENCY**

**ADDRESS.**



87.     On information and belief, Tether International, S.A. de C.V. advised that the **SUBJECT VIRTUAL CURRENCY ADDRESS** contains 2,117,677.97 USDT.

88.     Given the limited known universe of fraud victims to date, it is reasonable to infer that there may be more unknown fraud victims proceeds present in the **SUBJECT VIRTUAL CURRENCY ADDRESS**, based on the ample evidence of the nature, scale, and mode of operation of this cryptocurrency investment fraud-money laundering scheme and publicly available information from the FBI IC3 collation and annual database reports, e.g., https://www.ic3.gov/AnnualRport/Reports/2025_IC3Report.pdf, reflecting the widespread prevalence of this crime typology that is recognized as substantially underreported over the past several years.

89.     Regardless, as set forth above, it is respectfully submitted that the financial transactions depicted and chronicled above manifestly exhibit complex money laundering techniques and should any funds contained in the **SUBJECT VIRTUAL CURRENCY ADDRESS** be non-fraud proceeds, they are property subject to seizure and forfeiture as property involved in the multitude of dizzying money laundering financial transactions depicted above.

## FIRST CLAIM OF FORFEITURE

90.     Pursuant to 18 U.S.C. § 981(a)(1)(C), the defendant property contained in the **SUBJECT VIRTUAL CURRENCT ADDRESS** constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity as defined by 18 U.S.C. § 1956(c)(7) that is includes a further listing of specified unlawful activity in 18 U.S.C. § 1961, that includes wire fraud, 18 U.S.C. § 1343, is subject to forfeiture to the United States.

**SECOND CLAIM OF FORFEITURE**

91.     Pursuant to 18 U.S.C. § 981(a)(1)(A), the defendant property contained in the **SUBJECT VIRTUAL CURRENCT ADDRESS** is involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and 1957, or any property traceable to such property is subject to forfeiture to the United States.

**CONCLUSION**

Wherefore, Plaintiff, the United States of America, requests this Court to issue a Warrant for Arrest In Rem; that upon successful execution of the Warrant for Arrest In Rem, the United States Marshal, or other authorized law enforcement official, obtain the substitute res for the defendant property to effect the in rem jurisdiction of this Court; that due notice be provided to all to appear and show cause why forfeiture should not be decreed; that the res be forfeited and condemned to the United States of America; that the Plaintiff be awarded its costs and disbursements in this action; and such further relief as this Court deems just and proper.

Dated: 28 July 2026

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

S/ Jafer Aftab
Jafer Aftab
N.J. Bar 050341997
Assistant United States Attorney
United States Attorney's Office
District of Columbia
(202) 252-6714
Jafer.Aftab@usdoj.gov

**VERIFICATION**

I, Richard Gregory, a Task Force Officer with the United States Secret Service, verify under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint <u>In Rem</u> and Statement of Probable Cause is true and correct.

Executed on this 28th day of July 2026

_____
Richard Gregory
Task Force Officer
United States Secret Service